UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---------------------------------------------------
                                          :
JERRY YOUNGBEY, *et al.*,                 :
                                          :    CASE NO. 1:09-CV-00596
              Plaintiffs,                 :
                                          :
                                          :
       v.                                 :    OPINION & ORDER
                                          :    [Resolving Doc. Nos. 83, 84, 85, 86, 87, 88,
                                          :      89, 90, 91]
DISTRICT OF COLUMBIA, *et al.*,           :
                                          :
              Defendants.                 :
                                          :
---------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

       In this civil rights suit, Plaintiffs Jerry Youngbey and Rubin Butler sue the District of

Columbia and several members of the D.C. Metropolitan Police Department for injuries they

allegedly sustained following the police officers' search of their home.[1] Defendants Charles

Yarbaugh, Jose Acosta, Darrin March, Larry Scott, Raymond Chambers, Duane Fowler, Sean

McLaughlin, Christopher Smith, Thomas Miller, Darryl Thompson, Lonnie Bruce, Timothy

Dumontt, and the District of Columbia now file separate motions for summary judgment.[2]  [Doc.

83; Doc. 84; Doc. 85; Doc. 86; Doc. 87; Doc. 88; Doc. 89; Doc. 90; Doc. 91.]  The motions are

opposed.  [Doc. 96; Doc. 97; Doc. 98; Doc. 99; Doc. 100; Doc. 101; Doc. 102; Doc. 103; Doc. 104.]

_____

       [1] The Defendants are the District of Columbia, Officers Jose Acosta, Lonnie Bruce, Timothy Dumontt, Duane
Fowler, Sean McLaughlin, Thomas Miller, Christopher Smith, Darryl Thompson, Sergeants Charles Yarbaugh and
Raymond Chambers, Detective Darin March, and Lieutenant Larry Scott.  [Doc. 80.]

       [2] Although the Defendants move for summary judgment separately, the legal arguments in the motions are
factually and legally similar and to the extent possible, the Court considers the motions as a group.

-1-

Defendants Acosta, Bruce, Chambers, Dumontt, Fowler, March, McLaughlin, Miller, Smith, Thompson, Yarbaugh, and the District of Columbia replied. [Doc. 107; Doc. 109; Doc. 110; Doc. 111; Doc. 112; Doc. 113; Doc. 114; Doc. 115; Doc. 116.]

For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' motions for summary judgment.

## I. Background

On July 16, 2008, Robert Mallory died from several gunshot wounds and the District of Columbia Deputy Medical Examiner determined the cause of death to be homicide. [Doc. 85 at 3.] Defendant Detective Darin March, then employed by the Violent Crimes Branch of the Metropolitan Police Department ("MPD"), investigated the murder. [*Id.*] A confidential source told March that John Youngbey, Plaintiff Jerry Youngbey's adult son, had been in an altercation with a man named "Rob" and that Youngeby indicated that he was going to take revenge on "Rob." [*Id.* at 4; Doc. 99 at 2.] This same source also shared that she had heard that John Youngbey had admitted to the murder of Robert Mallory. [*Id.* at 2; Doc. 85 at 4.]

Detective March discovered from the Court Service and Offender Supervision Agency that John Youngbey lived with his mother, Plaintiff Youngbey, at her home on 1312 Queen Street NE, Washington, D.C. [*Id.* at 4.] March also performed a WALES check that confirmed that this address was John Youngbey's current address. [*Id.* at 4.] However, John Youngbey did not live at that address at the time of the application for and execution of the search warrant. He had not lived with his mother since 2004. [Doc. 100 at 4.]

Detective March prepared an "Affidavit in Support of an Application for Search Warrant," requesting to search the Queen Street address, along with several others, "for the seizure of any

firearms including spent cartridges and bullet fragments, ammunition, holsters, gun cleaning kits, paper showing ownership receipts, photographs and papers that document criminal activity, a relationship between John YoungBey, Michael Fluellyn, Avonte Palmer, and the decedent, and additional documentation that provides a link between John YoungBey and this or any other address." [Doc. 85 at 4-5.] The affidavit did not contain a request for nighttime execution, nor did it assert that the warrant could not be executed during daylight hours, that the property sought was likely to be removed or destroyed if not seized immediately, or that the property sought was unlikely to be found except at certain times or under certain circumstances. [Doc. 85-2; Doc. 99 at 2.]

On August 13, 2008, and after reviewing March's affidavit, District of Columbia Superior Court Judge John R. Hess issued search warrant 2008 CRWSLD 3070. [Doc. 85 at 5; Doc. 99 at 2.] Judge Hess found probable cause to believe that the material sought in the affidavit was present at Youngbey's home on Queen Street. [Doc. 85-2.] The warrant further read, "you are hereby authorized to search in the daytime/at any time of the day or night." [Id.] No part of this language was crossed out, circled, or marked in any way. [Id.; Doc. 99 at 2.]

Upon receiving the search warrant from Judge Hess, Detective March requested that the MDP's Emergency Response Team assist with the warrant's execution. [Doc. 86 at 3; Doc. 99 at 3.] Lieutenant Larry Scott – commander of the Special Operations Division of the MPD, which included the Emergency Response Team – reviewed the warrant and assigned the team of Sergeant Chambers the lead role during the execution. [Doc. 86 at 3; Doc. 87 at 4; Doc. 101 at 3.] Sergeant Raymond Chambers was also assigned the drafting of a plan for the warrant's execution. [Doc. 86 at 3; Doc. 87 at 4; Doc. 101 at 3.] Thus, Sergeant Chambers was responsible for making logistical arrangements necessary for the search. [Doc. 87 at 4.] Sergeant Chambers, as well as Defendant

officers Timothy Dumontt, Duane Fowler, and Lonnie Bruce consulted with Detective March, scouted the Queen Street location, and made other miscellaneous arrangements in preparation for the execution of the warrant. [Doc. 87 at 4; Doc. 88 at 2; Doc. 90 at 4-5; Doc. 97 at 3.] Defendant officers Dumontt and Bruce and Sergeant Chambers read the search warrant and supporting affidavit. [Doc. 97 at 3; Doc. 98 at 3.] Sergeant Chambers drafted a search plan, which was actually typed by Officer Dumontt. [Doc. 87 at 4; Doc. 88 at 3; Doc. 90 at 4; Doc. 97 at 3.] This plan was reviewed and approved by Lieutenant Scott. [Doc. 86 at 4; Doc. 87 at 4.] Although the plan did not specify the time of day for the search, Sergeant Chambers and Lieutenant Scott agreed that the best time to conduct the search was at 4 A.M. [Doc. 86 at 4; Doc. 87 at 4-5; Doc. 101 at 3.] Detective March also admits that he discussed the search with the Emergency Response Team and agreed that the search should be conducted at 4 A.M. [Doc. 85 at 5; Doc. 87 at 4.]

Several days before the search of Plaintiff Youngeby's residence at Queen Street, Sergeant Charles Yarbaugh, a member of the Emergency Response Team of the MPD, was also told that his team would assist in the execution of the Queen Street search. [Doc. 83 at 3; Doc. 102 at 2.] Sergeant Yarbaugh acted as the leader of an eight man team that was assigned to secure the top-floor of Plaintiff Youngeby's home. [Doc. 83 at 3.] Sergeant Yarbaugh says that he was not shown the warrant, but that he was given other background information about the investigation. [Id.]

At approximately 2 A.M., on August 20, 2008, the Emergency Response Team conducted an operational briefing, led by Officer Dumontt, during which all of the officers involved were provided with the details of the search warrant execution plan. [Doc. 89 at 6; Doc. 90 at 6; Doc. 97 at 3.] At about 4 A.M., on the same night, approximately twenty-one officers from the Emergency Response Team approached the residence of the Plaintiffs on Queen Street. [Doc. 90 at 6; Doc. 101

at 3.] Officer Dumontt led the line of officers who approached the front door. [Doc. 90 at 6.] Officers Thomas Miller and Darryl Thompson were assigned the duty of knocking and announcing the presence of the officers and forcing entry if necessary. [Doc. 89 at 6.] Plaintiff Youngbey and Plaintiff Butler were asleep in the house. [Doc. 101 at 3.] Plaintiff Youngeby was asleep in her upstairs bedroom and Plaintiff Butler was asleep in his basement apartment. [Id.]

Officer Miller says that he announced their presence and knocked on the door with a halligan bar; when nobody answered, he began to pry at the front metal security door with the bar. [Doc. 89 at 6.] When that was not successful, Officer Miller broke a living room window, causing glass to shatter onto a couch, and Officer Timothy Dumontt threw one or two flash-bang grenades into the house, which caused some of the living room furniture to catch fire. [Doc. 89 at 6; Doc. 90 at 6; Doc. 97 at 4; Doc. 97-17.] Officer Bruce entered through the window and says that he yelled "Police with a search warrant." [Doc. 90 at 6.] Other Emergency Response Team officers also entered the house through the broken window. [Id.] When the police began their no-knock entry by breaking the window, Plaintiffs Youngbey and Butler say they awoke and also say that the police never knocked or announced their presence before forcing an entry. [Doc. 96 at 2; Doc. 97-17.] Youngbey says that she heard breaking glass and thought that burglars were breaking into the house and called 911. [Doc. 89 at 6-7; Doc. 101 at 3.]

The officers assigned to Sergeant Yarbaugh immediately proceeded upstairs, while those assigned to Sergeant Chambers began to secure the first floor of the home. [Doc. 83 at 4; Doc. 87 at 5; Doc. 102 at 3.] Sergeant Yarbaugh and another officer entered the first room on the second floor, which was unoccupied. [Doc. 83 at 4.] The other officers in the upstairs team checked the other rooms in pairs – Defendant Officer Jose Acosta entered Plaintiff Youngbey's bedroom. [Doc.

84 at 4; Doc. 102 at 3.] Plaintiff Youngbey says that the police shouted, "Open up, police!" and began battering her bedroom door. [*Id.*] Youngbey says that she then opened the door, allowing Officer Acosta into the room. [*Id.*] Plaintiff Youngbey was wearing only a tank-top at the time and she says that the shirt left the entire lower portion of her body exposed. [Doc. 96 at 2; Doc. 102 at 3-4.] Plaintiff Youngbey further says that Officer Acosta pointed an assault rifle in her face at close range and then ordered her to lay down on the floor. [Doc. 102 at 3-4.] Youngbey states she immediately complied with the order. [Doc. 96 at 3.] She alleges that multiple officers, including Sergeant Yarbaugh, entered the room and that Officer Acosta and Sergeant Yarbaugh physically held her to the floor. [Doc. 102 at 3-4.] During this time, Youngbey claims that Officer Acosta kept his assault rifle pointed directly at her. [Doc. 96 at 3.] After about five to ten minutes of this treatment, Plaintiff Youngbey says that Officer Acosta allowed her to put on a bathrobe. [Doc. 102 at 3-4.] Plaintiff says that she was then handcuffed and further questioned in her bedroom. [*Id.*]

The Defendant officers who searched the upstairs of the house recall the facts differently. Officer Acosta says that he never pointed his firearm directly at Plaintiff Youngbey, and instead says he held the firearm downwards at all times. [Doc. 84 at 4.] The Defendants also say that the Plaintiff's tank top hung past her waist and that she did not appear naked. [*Id.*] Officer Acosta also claims that he immediately allowed the Plaintiff to put on a bathrobe. [*Id.*] Sergeant Yarbaugh says that he only entered the Plaintiff's bedroom for "less than three or four seconds." [Doc. 83 at 4.] During this time, Yarbaugh says that he saw Plaintiff Youngbey sitting on her bed wearing a bathrobe and that he also managed to speak to Youngbey, telling her that negotiators from the Emergency Response Team would be there shortly. [*Id.*] Sergeant Yarbaugh says he then left Youngbey's bedroom and waited on the second floor until the entire house was secured. [*Id.*]

While the first group of officers was upstairs, another group of officers, led by Sergeant Chambers, and that included Defendant Officers Duane Fowler and Sean McLaughlin, secured the downstairs portion of the home. [Doc. 87 at 5; Doc. 88 at 3.] Officer Fowler proceeded through the living room and noticed Plaintiff Rubin Butler, who had come upstairs from the basement, standing in the kitchen. [Doc. 88 at 3; Doc. 103 at 5.] Although the officers did not announce themselves, Butler says he saw that their jackets said "POLICE." [Doc. 100 at 3.] Butler further says that the officers pointed assault rifles at him and forced him to lay on the floor. [Doc. 103 at 5.] Officer Fowler states that he told Butler to get down on the ground, but does not indicate if he pointed a gun at Butler or not. [Doc. 88 at 3.] Officer Fowler checked the bathroom behind Butler, confirmed that it was empty, and then came back and flex-cuffed Butler. [*Id.* at 3.] While the remainder of the house was being searched, Officer Fowler says he guarded Plaintiff Butler. [*Id.* at 3.] Officer McLaughlin says that he also remained stationed near Butler and that Defendant Officer Charles Smith, a member of the MPD Gun Recovery unit, guarded Plaintiff Butler after the Emergency Response Team was relieved. [*Id.* at 4.] Officer McLaughlin says that none of the officers stationed around Butler pointed their guns at Butler. [*Id.* at 3-4.] By contrast, Plaintiff Butler says that Officers Fowler, McLaughlin, and Smith took turns guarding him and that one of the officers guarding him kept a firearm directly aimed at him for the entire thirty minute period during which he was restrained on the floor. [Doc. 100 at 3; Doc. 103 at 5.]

While Plaintiffs Butler and Youngeby were being restrained, Defendant Officers Lonnie Bruce and Timothy Dumontt entered the home through the broken window and remained stationed in the living room. [Doc. 90 at 6.] Officer Dumontt forced the jammed metal security door open with a battering ram and says that he did not damage the wooden front door in the process. [*Id.*]

Plaintiffs Butler and Youngbey were both moved to the living room, and were detained on the couch for about thirty minutes while the officers at the scene finished their search. [Doc. 98 at 5.] In total, the Emergency Response Team was at the Queen Street location for about forty-five minutes until the Homicide and Gun Recovery Units took over. [Doc. 83 at 5; Doc. 84 at 5.] Detective Darin March did not enter Plaintiff Youngbey's residence, although he was nearby during the search. [Doc. 85 at 5.] Similarly, Lieutenant Scott monitored the search via a police radio and only approached the house after the property was secured. [Doc. 86 at 4; Doc. 101 at 4.] He says he did not enter Plaintiff Youngbey's house. [Doc. 86 at 4; Doc. 101 at 4.]

On December 1, 2010, the Plaintiffs filed a second amended complaint, asserting nine causes of action. [Doc. 80.] First, the Plaintiffs make claims under 42 U.S.C. § 1983, claiming violations of their Fourth Amendment rights against Defendants Acosta, Bruce, Chambers, Dumontt, Fowler, March, McLaughlin, Miller, Thompson, Scott, Smith, and Yarbaugh. [Id. at ¶¶ 54-59.] Specifically, Plaintiffs say that the Defendants Bruce, Chambers, Dumontt, Fowler, March, and Scott violated their rights by planning and participating an unauthorized nighttime search, that Defendants Miller and Thompson violated their rights by failing to knock and announce before entering the home, that Defendants Bruce, Dumontt, March, and Yarbaugh violated their rights by using excessive force and that Defendants Scott and Chambers proximately caused such violations by failing to properly supervise the search. [Id.] Second, the Plaintiffs assert a claim of assault under District of Columbia law against Defendants Acosta, Fowler, McLaughlin, Miller, Smith, Yarbaugh, and the District of Columbia. [Id. at ¶ 60.] Third, the Plaintiffs bring a false arrest claim under District of Columbia law against Defendants Bruce, Chambers, Dumontt, Fowler, March, Scott, and the District of Columbia. [Id. at ¶ 61.] Fourth, the Plaintiffs assert a claim of trespass to chattels and conversion

under District of Columbia law against Defendants Chambers, Dumontt, Miller, Thompson, and the District of Columbia.  [*Id.* at ¶ 62.]  Fifth, the Plaintiffs plead trespass under District of Columbia law against Defendants Chambers, Dumontt, Miller, Thompson, and the District of Columbia.  [*Id.* at ¶ 63.]  Sixth, the Plaintiffs bring a claim of negligence *per se* under District of Columbia law for the violation of D.C. Code § 23-523 against Defendants Bruce, Chambers, Dumontt, Fowler, March, Scott, and the District of Columbia.  [*Id.* at ¶ 64.]  Seventh, the Plaintiffs assert a claim of intentional infliction of emotional distress under District of Columbia law against Defendants Acosta, Dumontt, Miller, Thompson, Yarbaugh, and the District of Columbia.  [*Id.* at ¶ 65.]  Eighth and ninth, Plaintiffs assert *Monell* claims against the District of Columbia for violations of their Fourth Amendment rights due to an alleged unlawful nighttime execution of the search warrant and the alleged failure of the officers to knock and announce before forcibly entering their home.  [*Id.* at ¶¶ 66-67.]  As a result of the search, Youngbey and Butler both claim they suffered "numerous injuries and damages, including physical pain and suffering, loss of liberty, emotional distress, shame and humiliation."  [Doc. 80 at ¶¶ 48-52.]

## II. Legal Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[C]ourt[s] must look to the substantive law on which each claim rests" to determine which facts are material. *Brehm v. Dep't of Defense*, 577 F. Supp. 2d 446, 448 (D.C. Cir. 2008) (citations omitted). "A genuine issue is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action." *Id.* (internal quotations marks and citation omitted).

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). However, the moving party is under no "express or implied" duty to "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts. *Id.* at 586. Nor can the nonmoving party "rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e).

The nonmoving party must "present specific facts that would enable a reasonable jury to find in its favor." *Brehm*, 577 F. Supp. 2d at 448 (citations omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party and accept the nonmoving party's evidence as true. *Brehm*, 577 F. Supp. 2d at 448 (citations omitted). The issue of material fact does not have to be resolved conclusively in favor of party asserting its existence, but that party is required to present sufficient evidence supporting the claimed factual dispute so that a judge or jury must resolve the parties' differing versions of the truth at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968); see also *Celotex,* 477 U.S. at 322.

**III. Discussion**

*III.A   Fourth Amendment Claims – Count 1*

The Plaintiffs assert causes of action under 42 U.S.C. § 1983 claiming violations of their Fourth Amendment rights against Officers Acosta, Bruce, Chambers, Dumontt, Fowler, March, McLaguhlin, Miller, Thompson, Scott, Smith, and Yarbaugh. Although lumped together into Count 1 of the complaint, the Plaintiffs actually allege several different actions that they claim violated their Fourth Amendment rights. First, the Plaintiffs say that Defendants Bruce, Chambers, Dumontt, Fowler, March, and Scott violated their rights by planning a nighttime search when the search warrant did not authorize such search. [Doc. 80 at ¶ 55.] Second, Plaintiffs say that Defendants Acosta, Fowler, McLaughlin, Smith, and Yarbaugh violated their rights by using excessive force, such as pointing guns and requiring Plaintiff Youngbey to lay partially naked on the floor, and that Defendants Chambers and Scott are vicariously liable for any violations for failing to properly supervise the search. [*Id.* at ¶ 57.] Third, the Plaintiffs say that Defendants Miller and Thompson violated their rights by failing to knock and announce before entering the home and that Defendants Chambers and Scott are also vicariously liable for this conduct. [*Id.* at ¶¶ 56, 58.]

When sued for damages under Section 1983, state officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Komongnan v. U.S. Marshals Service*, 471 F. Supp.2d 1, 6 (D.D.C. 2006) (internal quotation marks and citation omitted). Where the facts are disputed, the court will accept the plaintiffs' version,

because the plaintiffs are the nonmoving party. *KRL v. Moore*, 512 F.3d 1184, 1189 (9th Cir. 2008).

In determining whether a defendant is entitled to qualified immunity, the Court must employ a two-part analysis. The Court must determine (1) whether, taken in the light most favorable to the plaintiff, whether the facts alleged constitute a violation of a constitutional right and (2) whether the constitutional right at issue was clearly established at the time of the defendant's conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Courts have discretion, based on the circumstances of the case, to decide which of the two inquiries should be addressed first. *Pearson*, 129 S. Ct. at 818 (2009).

Even if the court determines that "a constitutional right would have been violated on the facts alleged," *Komongnan*, 471 F. Supp.2d at 6 (citation omitted), the officials are immune from suit unless they "knew, or were unreasonable in not knowing, that their behavior violated the Constitution [or a statutory duty]." *Id.* (internal quotation marks and citation omitted). The standard is the objective reasonableness of the officers' conduct. *Harlow v. Fitzgerald*, 457 U.S. at 818. "Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time." *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (1989). Furthermore, officers with a duty to inquire into the scope and nature of the warrant are not entitled to qualified immunity on the basis of reliance on a warrant. *See Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986).

i. Nighttime Execution of a Search Warrant

The Plaintiffs say that Defendants Bruce, Chambers, Dumontt, Fowler March, and Scott violated their Fourth Amendment rights because the search was unreasonable as the search warrant was executed at night when the plain language of the warrant did not execute such search. [Doc. 97

at 1; Doc. 98 at 1; Doc. 99 at 1; Doc. 101 at 1.]  The Defendants say that the search was authorized

and that the Defendants are entitled to qualified immunity.  [Doc. 85 at 1-2; Doc. 86 at 1; Doc. 87

at 1-2; Doc. 90 at 1.]

The Fourth Amendment of the United States Constitution protects persons "against

unreasonable searches and seizures" and states that a warrant shall only be issued "upon probable

cause, supported by oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized."  U.S. Const. Am. IV.  Although there is no particular requirement

that warrants must specify the time of day that they are to be executed, nighttime searches are

historically considered constitutionally unreasonable if the search warrant does not specifically

provide for them.  *Jones v. United States*, 357 U.S. 493, 498-99 (1958) ("it is difficult to imagine

a more severe invasion of privacy than the nighttime intrusion into a private home that occurred in

this instance . . . [t]he Criminal Rules specifically deal with searches of this character by restricting

nighttime warrants to situations where the affidavits upon which they are issued") (internal

quotations omitted);  *O'Rourke v. City of Norman*, 875 F.2d 1465, 1473-75 (10th Cir. 1989)

(discussing historical and modern aversion to nighttime searches); *see also Dorman v. United States*,

435 F.2d 385, 393 (D.C. Cir. 1970) ("the fact that an entry is made at night raises particular concern

over its reasonableness").  Similarly, law enforcement generally may not exceed the terms of the

authorizing warrant when making an arrest or conducting a search, as such action would be

constitutionally unreasonable.  *See Marron v. United States*, 275 U.S. 192, 196-97 (1927).

D.C. Code Section 23-523 provides that "[a] search warrant may be executed on any day of

the week and, in the absence of express authorization in the warrant pursuant to section 23-521(f)(5),

shall be executed *only* during the hours of daylight."  D.C. Code § 23-523 (emphasis added).  D.C.

Code Section 23-521(f)(5) provides, in turn, that a search warrant is only executable during the day, unless "the [reviewing] judicial officers have found cause therefor, including one of the grounds set forth in section 23-522(c)(1), and authorization for execution at any time of day or night." D.C. Code § 23-521(f)(5). Under Section 23-522(c)(1), a search warrant *may* be made executable at "any hour of the day or night upon the ground that there is probable cause to believe that (1) it cannot be executed during the hours of daylight, (2) the property sought is likely to be removed or destroyed if not seized forthwith, or (3) the property sought is not likely to be found except at certain times or in certain circumstances." D.C. Code § 23-522(c).

Thus, under District of Columbia law, a search warrant does not authorize a nighttime search unless the terms of the warrant provide that the search may be executed at night and the warrant is supported by probable cause that one of the special circumstances in Section 23-522(c) applies. *See Matter of L.J.W.*, 370 A.2d 1333, 1335 n.5 (D.C. App. 1977) ("The warrant, however, must, on its face, authorize 'execution at any time of day or night' where the issuing officer has found cause for such execution under s 23-522(c)"); *see also Irwin v. State*, 415 So.2d 1181, 1182 (Ala. Crim. App. 1982) (holding that a search warrant that did not specify a time of day could not be executed at night); *Moore v. United States*, 57 F.2d 840, 843 (5th Cir. 1932) (same); *Johnson v. United States*, 46 F.2d 7, 9 (6th Cir. 1931) ("Warrants which contain no direction or permission for service in the nighttime, must be served in the daytime.").

Here, the search warrant issued by Judge Hess does not strike out the "daytime" or "any time of the day or night" designations, which leaves the limits of the search authorized ambiguous, at best. Moreover, the affidavit submitted in support of the search warrant application makes no reference to any of the factual circumstances in which a nighttime search may be executed under

District of Columbia law and does not anywhere request authorization to search at night.  *See Hines v. United States*, 442 A.2d 146, 147-50 (D.C. App. 1982); *Spence v. United States*, 370 A.2d 1351, 152 (D.C. App. 1977)* ("a nighttime search warrant may be authorized if the officer requesting the warrant states orally under oath or includes as part of the written application the substance of one of the grounds for authorizing such warrants contained in D.C.Code 1976 Supp. III, s 23-522(c)").  The D.C. Code requires a showing of probable cause to believe that the search warrant could not be executed during the day, that property to be searched for was likely to be removed unless seized forthwith, or that property to be searched for would be on the premises to be searched only at certain times.  *Id.* at 1353.  This standard was not met here.[3]  Thus, because the magistrate judge did not strike out either the daytime or anytime provision on the search warrant and the affidavit did not request or provide any evidence justifying a nighttime search, the warrant issued only authorized a daytime search.

The Defendants' reliance on *Commonwealth v. Garcia*, 501 N.E.2d 259, 262 (Mass. App. Ct. 1986), is fundamentally misguided.  In that case, the court found that a search warrant that authorized any search "in the daytime (or at any time of the day or night)," with no portions crossed out, authorized a nighttime search.  *Id.*  Defendants argue this case lends weight to the argument that a failure to circle or cross out a term in the current search warrant also authorized a nighttime search.  [Doc. 109 at 4.]  However, this argument ignores the salient point that Massachusetts and District of Columbia law differ on the showing required for a nighttime search.  Under

---

[3] Oral recitation under oath of the facts supporting one of the D.C. Code § 23-522(c)(1) grounds for a night-time search is sufficient for a warrant to validly authorize a night-time search on its face, although written facts in the affidavit are preferable. *See L.J.W.*, 370 A.2d at 1335 n. 4.  However, no evidence is presented that facts supporting a nighttime search were recited to Judge Hess prior to his issuance of the search warrant.

Case No. 1:09-CV-00596
Gwin, J.

Massachusetts law "there is no separate or additional requirement that there be a showing that cause exists for the issuance of a warrant to search in the nighttime." *Commonwealth v. Grimshaw*, 595 N.E.2d 302, 304 (Mass. 1992) (citation omitted).  Thus, in *Garcia*, the issuance of a proper nighttime warrant depended only on whether the issuing judge circled that provision or not.  By contrast, under District of Columbia law, a nighttime search is not authorized unless the warrant provides for a nighttime search and the warrant is supported by probable cause that one of the circumstances in  Section 23-522(c) applies.  *L.J.W.*, 370 A.2d at 1335 n.5.

Indeed, the Defendants' argument that not striking out either term authorizes a search at any time runs counter to the statutory scheme of D.C. Code Section 23-521 and 23-523, which specifically limits nighttime searches to a handful of situations.  Under the Defendants' logic, every preprinted warrant would automatically authorize a nighttime search whether or not the required probable cause showings were made.  *See Perez v. Borough of Berwick*, 2009 WL 1139642, at *8 (M.D. Pa. 2009) (interpreting similar statutory scheme under Pennsylvania state law and concluding that a warrant that is silent regarding a nighttime search does not authorize such search).  Accordingly, the Defendant Officers' planning and execution of a nighttime search violated the Plaintiffs' Fourth Amendment rights because the search warrant plainly did not authorize nighttime execution.[4]

Therefore, the first prong of the qualified immunity test is established in Plaintiffs' favor as to Defendants Bruce, Chambers, Dumontt, Fowler, March, and Scott since all of these Defendants

---

[4] *See also United States v. McCarty*, 475 F.3d 39, 44 (1st Cir. 2007) (upholding search as permissible that occurred after nighttime hours under Maine law, even though warrant did not authorize a nighttime search, where search began during the day); *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004) (holding nighttime search issued to state officer was lawful where judge accidentally did not authorize a nighttime search, but later called police to amend the search warrant).

participated in the planning of the search that violated Plaintiffs' Fourth Amendment rights. Because the Plaintiffs establish that a reasonable jury could find the conduct of the Defendant Officers executing and planning of an unauthorized nighttime search was objectively unreasonable, the Court must now determine if such a finding would indicate that the Defendants violated a clearly established constitutional right. *Pearson*, 129 S. Ct. at 818. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Here, the search warrant did not explicitly authorize a nighttime search; relying on it to plan and execute a search in the nighttime was, therefore, not reasonable. In *Malley v. Briggs*, the Supreme Court explained that it is unreasonable for an officer to rely on a search warrant issued by a magistrate judge when a reasonably well-trained officer would have been aware that the affidavit failed to establish probable cause. 475 U.S. 335, 345 (1986). If the affidavit is such that no officer of reasonable competence would have requested the warrant, then acting upon the warrant would be unreasonable. *Id.* at 346 n. 9.

In this case, the affidavit did not even request, let alone establish probable cause for a nighttime search, and no reasonable officer would have thought that the warrant authorized a nighttime search. In *United States v. Burch*, the District of Columbia Circuit held that it was not objective unreasonable for an officer to rely upon a warrant in executing a nighttime narcotics search where the magistrate neglected to cross-out the "daytime" clause because "both federal and local law specifically provide for nighttime narcotics searches" in *all* cases and a nighttime search was requested in the accompanying affidavit. 156 F.3d at 1326. Here, the Judge also failed to cross-out the "daytime" or "any time of the day or night" clauses, but by contrast, the Defendant officers never

-17-

requested a nighttime search and Detective March did not include any information in the supporting affidavit that would establish the required probable cause for such nighttime search. *See United States ex. rel. Boyance v. Myers*, 398 F.2d 896, 988 (3d Cir. 1968) (holding that where a warrant authorized only a daytime search that "on the issue of reasonableness of searching an occupied house at 2 a.m. the searcher's case is certainly no better than it would have been if no warrant had been issued, probably worse.").

Therefore, the Court **DENIES** the motions for summary judgment filed by Defendants Bruce, Chambers, Dumontt, Fowler, March, and Scott as to Count 1 of the second amended complaint with regard to the portions of Count 1 that allege a violation of the Fourth Amendment due to the unlawful execution and planning of a nighttime search.

ii. Unreasonable Use of Force

The Plaintiffs also claim that the Defendants Acosta, Fowler, McLaughlin, Smith, and Yarbaugh violated their Fourth Amendment rights by using excessive force during the execution of the search warrant, specifically by pointing guns at the Plaintiffs and by requiring Plaintiff Youngbey to lay partially naked on the floor. [Doc. 80 at ¶¶ 57-58; Doc. 96 at 1; Doc. 102 at 1; Doc. 103 at 1.] The Plaintiffs also assert excessive force claims against Defendants Chambers and Scott for a failure to properly supervise the execution of the search, which Plaintiffs say resulted in the Fourth Amendment violations. [Doc. 98 at 1; Doc. 101 at 1.] The Defendants say that no constitutional violations occurred and that all of these officers are entitled to qualified immunity. [Doc. 83 at 1; Doc. 84 at 1; Doc. 86 at 1; Doc. 87 at 1; Doc. 88 at 1.]

"In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Rettele*, 550 U.S. at 614. "The test of

reasonableness under the Fourth Amendment is an objective one," and "[u]nreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time." *Id.* (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. O'Connor*, 490 U.S. 386, 396 (1989). "[T]he proper inquiry . . . is whether the officers' actions were so excessive that no reasonable officer on the scene could have believed that they were lawful." *Scott v. District of Columbia*, 101 F.3d 748, 760 (D.C. Cir. 1996).[5/]

Although law enforcement may permissibly approach suspects with weapons drawn, *Gales v. District of Columbia*, 47 F. Supp.2d 43, 46 (D.D.C. 1999), "approaching a suspect with a drawn weapon is an extraordinary measure." *Turmon v. Jordan*, 405 F. 3d 202, 207 (4th Cir. 2005) (internal citations and punctuation omitted). Generally, "[t]he use of force against a person who is helpless or [who] has been subdued is constitutionally prohibited." *Motley v. Parks*, 432 F.3d 1072, 1088 (9th Cir. 2005). Additionally, "law enforcement officers have the authority to detain occupants of a residence while a lawful search is being conducted." *Komongnan*, 471 F. Supp. 2d at 7 (citing *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981)). The Supreme Court has "posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: preventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the search, as detainees' self interest may induce them to open locked doors or locked containers to avoid the use of force." *Muehler v. Mena*,

---

[5/] In assessing reasonableness, a court should keep the factors set forth by the Supreme Court in *Graham v. Conner* in mind: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the safety of law enforcement or others; and (3) whether the suspect was resisting. *Graham*, 490 U.S. at 397.

544 U.S. 93, 98 (2005) (internal quotation marks and citation omitted).

For example, in *L.A. County v. Rettele*, police ordered the two occupants of a home, who were naked, to get out of bed and stand before them for about two minutes with guns drawn while the officers made sure no one else was on the premises and that no weapons were hidden. 550 U.S. at 615. These actions were deemed reasonable because once the officers secured the premises they allowed the occupants to put on clothes and because the occupants were not compliant and did not initially follow the officers' instructions. *See id.* at 616. Similarly, in *Muehler v. Mena*, the use of handcuffs for two to three hours to effectuate the detention was reasonable where the warrant authorized a search for weapons, a wanted gang member resided on the premises, and the police were outnumbered by the occupants two to one. 544 U.S. at 98, 100.

Taken in the light most favorable to the Plaintiffs, the facts here support a finding that the conduct of the Defendant Officers, who allegedly pointed firearms at and detained the Plaintiffs, constitutes a violation of the Plaintiffs' Fourth Amendment rights. According to the Plaintiffs, the Defendant Officers detained the Plaintiffs at gun-point long after the premises had been fully secured. For example, Plaintiff Youngbey say that Officer Acosta pointed an assault rifle in her face at point blank range and ordered her to lay on the floor, even after the officers confirmed her room was empty. [Doc. 96 at 2-3.] Youngbey further says that she was fully compliant with all of Officer Acosta's requests and did not act in a threatening manner. [*Id.*] Nonetheless, even though Youngbey was laying on the floor half-naked with multiple officers in the room, Youngbey says that Officer Acosta and Sergeant Yarbaugh continued to forcibly detain her for about five to ten minutes

at gun-point. [*Id.*]⁶⁄ If proven true at trial, this conduct would constitute excessive force. *See Retelle*, 550 U.S. at 615; *Mena*, 544 U.S. at 98, 100.

Similarly, Plaintiff Butler alleges that when Officer Fowler encountered him in the kitchen that Fowler pointed an assault rifle at him, handcuffed him, and then forced him to lay on the floor. [Doc. 103 at 4-5.] Plaintiff Butler further says that one of the Defendant officers – likely Officer Fowler, McLaughlin, or Smith – then took turns guarding him for the next half hour, during which time the officers constantly kept a firearm trained on him. [*Id.*] Again, if proven true, this conduct would constitute excessive force in violation of the Fourth Amendment. According to Plaintiff Butler, the officers kept him detained and trained a firearm on him well after the home was entirely secured. *See Turmon*, 405 F.3d at 207 (finding that it was unreasonable to handcuff a suspect and point a gun in their face where suspect was compliant and there was no evidence that suspect posed a danger to police); *Motley*, 432 F.3d at 1089 (finding that it is not reasonable for officer to train a firearm on an unarmed suspect who was not resisting or evading arrest); *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992) (same); *Edwards v. Giles*, 51 F.3d 155, 157 (8th Cir. 1995) (holding it was reasonable to point a gun at a suspect where officer believed suspect had committed a felony and was actively fleeing police); ; *Baker v. Monroe Tp.*, 50 F.3d 1186, 1193-94 (3d Cir. 1995) (handcuffing for twenty-five minutes and pointing guns at individuals not under criminal suspicion constitutes Fourth Amendment violation); *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) ("while police are not entitled to point their guns at citizens when there is no hint of danger, they are

_____

⁶⁄ The Court does not find Defendant Yarbaugh's argument persuasive that the inability of Plaintiff Youngbey to precisely quantify the amount of time that she saw Yarbaugh in her bedroom defeats her claim against him. [Doc. 110 at 2.] Indeed, if Youngbey was truly forced to lay on the floor with a gun pointed at her head, it is not surprising that she could exactly gauge the number of minutes that Yarbaugh stood in her room.

allowed to do so when there is reason to fear danger."); *United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008) (police may briefly detain an individual during a search while the premises are being secured).[7]

Accordingly, with the facts taken in the light most favorable to the Plaintiffs, the Court finds that the conduct of Officers Acosta, Fowler, McLaughlin, Smith, and Sergeant Yarbaugh arguably violated the Plaintiffs' Fourth Amendment right to be free from excessive force. Additionally, when supervisory officers fail to carry out their responsibility of keeping the execution of a search within constitutional bounds, they can become liable on an inadequate supervision theory. *See Haynesworth*, 820 F.2d at 1261. Although mere negligence is not enough to establish supervisory liability, actual or constructive knowledge of the means to be used to carry out the search is sufficient. *See Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004); *al-Kidd v. Ashcroft*, 580 F.3d 949, 965 (9th Cir. 2009) ("Supervisors can be held liable . . . for culpable action or inaction in training, supervision, or control of subordinates [or] for acquiescence in the constitutional deprivation by subordinates"). There are currently unresolved issues of material fact as to the extent of the knowledge, actions, and role of both Lieutenant Scott and Sergeant Chambers that most appropriately may be resolved by the trier of fact. *Gales*, 47 F. Supp.2d at 48-49; *Baker*, 50 F.3d at 1193-94 ("Although [defendant] did not personally use excessive force or order its use, we conclude that there is sufficient evidence to permit an inference that [defendant] knew of and acquiesced in the treatment the [plaintiffs] were receiving at the hands of the other officers acting

---

[7] At this stage in the proceedings, the Court is not persuaded by the Defendants' argument that Butler's failure to identify which Defendant pointed a gun at him defeats his excessive force claim. [Doc. 114.] Plaintiff Butler's recollection that Defendants Fowler, McLaughlin, and Smith were all in the kitchen and guarding him creates a material issue of fact as to all three Defendants.

under his supervision.").  Thus, the first prong of the qualified immunity test is satisfied as

Defendants Acosta, Fowler, McLaughlin, Smith, Yarbaugh, Scott, and Chambers.

Because the Plaintiffs establish that a reasonable jury could find the conduct of the

Defendant officers in executing the search warrant constituted excessive force, the Court must now

determine if such a finding would indicate that the Defendants violated a clearly established

constitutional right.  _Pearson_, 129 S. Ct. at 818.  "The relevant, dispositive inquiry in determining

whether a right is clearly established is whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted."  _Saucier_, 533 U.S. at 202.

At the time of the alleged constitutional violations, it would have been clear to the Defendant

officers that the they could not permissibly point firearms in the Plaintiffs' faces and detain them,

partially naked, after the home was secured and after it was clear that neither Plaintiff posed a threat.

_See Rettele_, 550 U.S. at 615-16 (holding that officers may not detain an individual any longer than

necessary to protect safety and secure premises); _Turmon_, 405 F.2d at 208 ("We conclude . .  it

would have been clear to a reasonable officer that he could not point his gun at an individual's face,

jerk him from his room, and handcuff him when there was no reasonable suspicion that any crime

had been committed, no indication that the individual posed a threat to the officer, and no indication

that the individual was attempting to resist or evade detention."); _Robinson_, 278 F.3d at 1015 ("The

development of the law with respect to arrests and detentions now allows us to recognize as a

general principle that pointing a gun to the head of an apparently unarmed suspect during an

investigation can be a violation of the Fourth Amendment, especially where the individual poses no

particular danger."); _Hutchinson v. West Virginia State Police_, 731 F. Supp.2d 521, 541 (S.D. W.Va.

2010) ("prolonged forced nakedness is a violation of clearly established rights.").  The Court

therefore finds that the Plaintiffs had a clearly established right not to be subjected to unreasonable force, specifically not to be detained in handcuffs, naked, and at gun-point well after the premises were secured.

Since the Plaintiffs present a conflicting version of facts that, if proven true, would establish a violation of a clearly established constitutional right, the Court concludes that Defendants Acosta, Fowler, McLaughlin, Smith, Yarbaugh, Scott, and Chambers are not entitled to qualified immunity; the Court therefore **DENIES** the motions for summary judgment on the excessive force portion of Count 1.

    iii.    <u>Knock-and-Announce</u>

Finally, the Plaintiffs say that Defendant officers Miller and Thompson violated their Fourth Amendment rights by not complying with the requirements of the "knock-and-announce" rule and that Lieutenant Scott and Sergeant Chambers also caused these violations due to a failure to properly supervise the entry into the home. [Doc. 80 at ¶¶ 56, 58.]

Generally, officers who enter a home pursuant to a warrant must comply with the "knock-and-announce" rule, which requires that officers announce their authority and purpose before entering and may resort to forcible entry only if denied admittance. *Hudson v. Michigan*, 547 U.S. 586, 592 (2006); *Wilson v. Arkansas*, 514 U.S. 927, 929 (1995). The "knock-and-announce" requirement, however, does not apply when officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or . . . would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *United States v. Banks*, 540 U.S. 31 (2003); *see also Richards v. Wisconsin*, 520 U.S. 385, 394-95 (1997); *United States v. Drummond*, 98 F. Supp.2d 44, 47 (D.D.C. 2000).

Officer Miller says that he knocked on the front security door with a halligan bar and announced police presence; when nobody answered, he says he began to pry at the front metal security door with the bar. [Doc. 89 at 6.] When that was not successful, Officer Miller broke a living room window and Officer Timothy Dumontt threw one or two flash-bang grenades into the house, which caused some of the living room furniture to catch fire. [*Id.*; Doc. 90 at 6; Doc. 97 at 4.] Plaintiffs Youngbey and Butler say that the Defendant officers never announced, knocked or announced their presence, and instead, immediately attempted to pry the door open. [Doc. 97 at 4; Doc. 97-17; Doc. 98 at 4; Doc 100 at 2.]

The Court finds that there are unresolved issues of material fact bearing on whether the no-knock entry was reasonable under the circumstances. Importantly, it is not clear whether Officers Miller and Thompson announced their presence and knocked or whether they completely forwent the "knock-and-announce" rule and immediately attempted to knock down the front door. Whether the Defendants acted reasonably with regard to the entry is a very close issue and a determination of whether the officers first knocked and announced, even if they waited only for a short time, will be dispositive on the issue of a constitutional violation. Taking the disputed facts in favor of the Plaintiffs – assuming that the Defendants did not knock and announce their presence – the Court finds that this behavior was arguably unreasonable, and if proven, would be a violation of the Fourth Amendment.

There is case law supporting the Defendants' contention that there was no need to comply with the requirements of the "knock-and-announce" rule where officers suspect that knocking may be dangerous or futile. For example, the District of Columbia Circuit wrote, while holding that a no-knock entry was reasonable during the execution of a search warrant, "there is agreement [among

Case No. 1:09-CV-00596
Gwin, J.

the circuits] that the presence of a firearm coupled with information such as a suspect's violent tendencies, criminal record, or specific violent threats is enough to create an exigency because the weapon might be used." *United States v. Geraldo*, 271 F.3d 1112, 1118 (D.C. Cir. 2001) (collecting cases).

Here, the Defendant officers were executing a "High Risk" search for John Youngbey, who was suspected of committing a homicide with an assault weapon. [Doc. 89 at 12.] However, distinguishing this case from *Geraldo* – and other cases allowing a no-knock entry – is that here the Defendants justify their entry only on the fact that John Youngbey was suspected of committing a homicide. [Doc. 86-2.] Exigent circumstances justifying a no-knock entry do not exist simply because a violent crime was committed. *See Poole v. United States*, 630 A.2d 1109, 1118-19 (D.C. App. 1993) (finding that exigent circumstances existed, because an occupant of the premises had a history of violence towards people and police that made it reasonable to suspect the occupant would likely use deadly force against the officers if they knocked and announced). "If a per se exception were allowed for each category of criminal investigation that included a considerable – albeit hypothetical – risk of danger to officers or destruction of evidence, the knock-and-announce element of the Fourth Amendments's reasonableness requirement would be meaningless." *Kornegay v. Cottingham*, 120 F.3d 392, 298 (3d Cir. 1997) (holding that an officers' no-knock entry was not reasonable as a matter of law merely because of the fact that there was a shooting and the murder weapon was not found) (quoting *Richards*, 520 U.S. at 394.).

In this case, the search warrant authorized the officers to search the premises for a firearm involved in a homicide, but the officers had no additional information to indicate a real risk of danger to themselves or of destruction of the evidence. For example, the Defendants did not have

-26-

Case No. 1:09-CV-00596
Gwin, J.

any particularized knowledge that an assault rifle was on the premises and never confirmed that John

Youngbey actually lived at his mother's home or would be found at the address. Here, the only

accurate information that the police possessed indicated that John Youngbey was a suspect in a

violent crime that recently occurred. Under the applicable case law, a belief that a suspect

committed a particular type of crime is insufficient to justify a no-knock entry and a determination

by the trier of fact as to whether the Defendants knocked and announced their presence is

appropriate.[8/]

Indeed, in most cases allowing for a no-knock entry, a suspicion that a violent crime was

committed was combined with other particularized suspicion that the execution of the warrant would

be dangerous to the officers (i.e. that the suspect would be found armed at the premises, or that the

suspect would be armed with a highly dangerous weapon). *See United States v. Crippen*, 371 F.3d

842, 846 (D.C. Cir. 2004) (presence of rocket launcher on premises constituted exigent circumstance

which justified no-knock entry during execution of search warrant); *United States v. Boulanger*, 444

F.3d 76, 82 (1st Cir. 2006) (no-knock entry justified during execution of search warrant where

suspect was involved in armed robbery, had a criminal background, police believed suspect was

armed, and suspect would be found at apartment); *United States v. Wardrick*, 350 F.3d 446, 452 (4th

---

[8/] Further, a jury determination of whether the amount of time that the Defendants allegedly waited after knocking was reasonable under the circumstances is also appropriate. A determination of a reasonable time to wait will depend upon "whether an objective experienced law enforcement officer would, under the totality of the circumstances, reasonably infer refusal of admittance." *United States v. Crippen*, 371 F.3d 842, 847 (D.C. Cir. 2004). "Only if a knock and announcement is loud enough to be heard, followed by a period long enough, in the particular circumstances, for an occupant to answer or come to the door, is there a constructive refusal of admittance to the premises . . . The duration of this pause will vary depending on factors such as the time of day . . . the size of the premises to which entry is sought, which may affect how long an occupant would need to reach the door . . . whether the officers perceive light, movement, or sounds reasonably indicating someone is up and about . . . or whether the police had reason to know, because they recently saw a person enter the place to be searched, that the premises is occupied." *Id.* (internal citations and punctuation omitted).

-27-

Cir. 2003) (no-knock entry justified during execution of search warrant where suspect had violent criminal history, illegally possessed firearms, and would be found at premises).

Because the Plaintiffs establish that a reasonable jury could find the conduct of the Defendant officers in executing the search warrant violated the "knock-and-announce" requirement of the Fourth Amendment, the Court must now determine if such a finding would indicate that the Defendants violated a clearly established constitutional right. *Pearson*, 129 S. Ct. at 818.

The Court finds that the requirements of the "knock-and-announce" rule were clearly established at the time the Defendants executed the search warrant. The contours and requirements of the "knock-and-announce" rule, as well as the situations during which officers could justifiably forgo the requirements of the rule due an exigency, were clearly established at the time of the search. *United States v. Ramirez*, 523 U.S. 65, 70 (1998). Indeed, it was also well-established that the mere fact that a violent crime is being investigated does not create an exigency alone. *Richards*, 520 U.S. at 394; *Geraldo*, 271 F.3d at 1118. Accordingly, the Court finds that the constitutional right in question was sufficiently established to satisfy the second prong of the qualified immunity analysis.

Since the Plaintiffs present a conflicting version of facts that, if proven true, would establish a violation of a clearly established constitutional right, the Court concludes that Defendants Miller and Thompson are not entitled to qualified immunity; the Court therefore **DENIES** the motion for summary judgment on the "knock-and-announce" portion of Count 1. Additionally, as already noted, when supervisory officers fail to carry out their responsibility of keeping the execution of a search within constitutional bounds, they can become liable on an inadequate supervision theory. *See Haynesworth*, 820 F.2d at 1261. There are currently unresolved issues of material fact as to the extent of the knowledge and role of both Lieutenant Scott and Sergeant Chambers that most

Case No. 1:09-CV-00596
Gwin, J.

appropriately may be resolved by the trier of fact; the Court therefore **DENIES** the motion for

summary judgment on the "knock-and-announce" portion of Count against both Defendants Scott

and Chambers. *See Gales*, 47 F. Supp.2d at 48-49; *Baker*, 50 F.3d at 1193-94.

*III.B   Assault – Count 2*

The Plaintiffs also assert a claim of intentional assault under District of Columbia law

against Defendants Acosta, Fowler, McLaguhlin, Miller, Smith, Yarbaugh, and the District of

Columbia.  [Doc. 80 at ¶ 60.]  The Plaintiffs say that the Defendant officers committed an assault

by "pointing a gun at [Plaintiff] Youngbey's head for 5-10 minutes, forcing her to lie half-naked on

the floor after it was clear there was no security risk, and forcing [Plaintiff] Butler to lie on the

kitchen floor with a gun aimed at his head for 30 minutes . . ." [*Id.*]  The Plaintiffs also say that the

District of Columbia is liable under a theory of *respondeat superior*.  [*Id.*]

Under District of Columbia law, an assault is "an intentional and unlawful attempt or threat,

either by words or acts, to do physical harm to the plaintiff."  *Holder v. District of Columbia*, 700

A.2d 738, 741 (D.C. App. 1997).  However, "[a] police has a qualified privilege to use reasonable

force to effect an arrest, provided that the means employed are not "in excess of those which the

actor reasonably believes to be necessary.'"  *Id.* (citing *Etheredge v. District of Columbia*, 635 A.2d

908, 916 (D.C. App. 1993).  In considering the reasonableness of a particular use of force, District

of Columbia courts look to the *Graham v. Connor* paradigm, as set forth by the Supreme Court.  *See*

*Etheredge*, 635 A.2d at 916; *Holder*, 700 A.2d at 742-43; *Rogala v. District of Columbia*, 161 F.3d

44, 57 (D.C. Cir. 1998) ("This standard is similar to the excessive force standard applied in the

Section 1983 context.").

The various factual disputes that the Court found relevant in denying the Defendant officer's

request for qualified immunity against the Fourth Amendment excessive force claim are also relevant here. The Plaintiffs allege that Defendants Acosta and Yarbaugh detained and pointed firearms at Plaintiff Youngbey and that Defendants Fowler, McLaughlin and Smith detained and pointed firearms at Plaintiff Butler. As the same basic framework for determining reasonable force is used in both the qualified immunity and privilege contexts, the Court also finds, taking all disputed facts in favor of the Plaintiffs, that the Defendant Officer's conduct is not privileged and would constitute assault if proven true. Accordingly, the Court **DENIES** the Defendants' motion for summary judgment on the assault claim as to Defendants Acosta, Fowler, McLaughlin, Smith, and Yarbaugh. The Court also **DENIES** the motion of the District of Columbia for summary judgment on this claim, since the District may be liable under a theory of *respondeat superior* for the torts of the Defendant officers, who were acting as agents of the District within the scope of their employment. *Bostic v. District of Columbia*, 906 A.2d 327, 331 (D.C. App. 2006).

*III.C   False Arrest – Count 3*

The Plaintiffs bring a false arrest claim under District of Columbia law against Defendants Bruce, Chambers, Dumontt, Fowler, March, Scott, and the District of Columbia. [Doc. 80 at ¶ 61.] The Plaintiffs say that the Defendant officers engaged "in an unprivileged and wrongful confinement . . . for the duration of their . . . search [and that this] false arrest violated . . . District of Columbia law." [*Id.*] The Plaintiffs also say that the District of Columbia is liable under a theory of *respondeat superior*. [*Id.*]

To prove a claim of false arrest under District of Columbia law, a plaintiff must show he or she suffered an imprisonment and that it was unlawful. *Profitt v. District of Columbia*, 790 F. Supp.

304, 310 (D.D.C. 1991).[9/] A good faith, reasonable belief in the validity of the detention is sufficient to defeat a claim of false imprisonment. *Id.* Thus, the Defendants are immune from the false arrest claim if "probable cause existed to arrest or that the arresting officer believed, reasonably and in good faith, that probable cause existed." *Minch v. District of Columbia*, 952 A.2d 929, 937 (D.C. App. 2008).

Here, the Plaintiffs state facts sufficient to support the allegation that the Defendants lacked a good faith, reasonable belief in the validity of the detention. The Defendant officers detained the Plaintiffs during a nighttime search outside of the warrant's scope and had reason to be aware of the detention's invalidity. Additionally, as already discussed, there are unresolved material issues of facts related to whether the manner and length of the actual detention was necessary. Because under the Plaintiffs' version of the facts, a reasonable officer would have realized that the detention was unnecessarily lengthy, the executing officers are not entitled to summary judgment on this claim.

In his motion for summary judgment, Defendant Lieutenant Scott also asserts a statute of limitations defense. [Doc. 86 at 6.] Lieutenant Scott was not a named party to this case until December 1, 2010, when the second amended complaint was filed. [Doc. 80.] The Plaintiffs concede that the one-year statute of limitations has run on this claim and consent to a dismissal of Count 3 against Defendant Scott. [Doc. 101 at 16.]

Accordingly, the Court **DENIES** summary judgment as to Officer Fowler, since there is a question of fact whether he falsely arrested Plaintiff Butler. The Plaintiff asserts claims of false arrest against Defendants Chambers, Bruce, Dumontt, and March for their role in planning the

---

[9/] "There is no practical distinction between the torts of false arrest and false imprisonment." *Stevens v. Stover*, 727 F.Supp. 668, 671 n. 6 (D.D.C.1990) (citing *Curry v. Giant Food Co. of D.C.*, 522 A.2d 1283, 1287 n. 3 (D.C. App. 1987)).

search. As a major factor in the reasonableness of the detention is the fact that it was part of an unauthorized nighttime search, the Court **DENIES** the summary judgment motions of these Defendants. The Court also **DENIES** the motion of the District of Columbia for summary judgment on this claim, since the District may be liable under a theory of *respondeat superior* for the torts of the Defendant officers. The Court **GRANTS** summary judgment as to Defendant Scott since the statute of limitations has run on this claim.

### III.D   Trespass to Chattels and Conversion – Count 4

The Plaintiffs make a claim of trespass to chattels and conversion under District of Columbia law against Defendants Chambers, Dumontt, Miller, Thompson, and the District of Columbia. [Doc. 80 at ¶ 62.] The Plaintiffs allege that these officers "intentionally interfered with plaintiff YoungBey's lawful possession of her personal property, including living room furniture, by damaging or destroying said property." [*Id.*] In entering the Plaintiffs' home, Officer Miller pried at the front door with a halligan bar and then broke a living room window. [Doc. 89 at 6.] Officer Dumontt then threw one or two flash-bang grenades through the window, which allegedly caused Plaintiff Youngbey's furniture to catch fire. [Doc. 89 at 6; Doc. 90 at 6; Doc. 97 at 4.]

As a preliminary matter, under District of Columbia law Plaintiffs may only recover for damage to personal property in their conversion and trespass to chattels causes of action. *See Duggan v. Keto*, 554 A.2d 1126, 1137 (D.C. App. 1987). Doors and windows are generally considered to be real property or fixtures to real property, and are thus not personal property. Accordingly, Plaintiffs may only recover for damage to living room furniture and other personal property destroyed during the search of the home under this claim.

Officers executing a search warrant may damage property if it is reasonable under the

circumstances to do so. *Dalia v. U.S.*, 441 U.S. 238, 258 (1979). In *United States v. Geraldo*, the use of flash-bang grenades was reasonable where one occupant was known to have a firearm and might be quick to use it. 271 F.3d 1112, 1118 (D.C. Cir. 2001). According to the second amended complaint, the majority of the property damage occurred due to the use of a flash bang grenade. The Defendants' only justification for the need for flash-bang grenades is that they thought a homicide suspect lived in the house and might have a gun. These facts do not rise to the level of those in *United States v. Geraldo* and fail to establish an exigency sufficient to justify use of such a device. Therefore, the executing officers were arguably unreasonable in use of the grenade, and the officers are not entitled to summary judgment for the damages caused by the flash bang grenade or for any other property damage that occurred during the no-knock entry.

The Court **DENIES** the summary judgment motion as to Defendants Miller, Thompson, and Dumontt, as all of these Defendants executed the entry into the home which caused the property damage. The Court also **DENIES** Defendant Chambers's motion since he participated in the creation of the plan for the execution of the search warrant, which provided for the use of such diversionary devices. [Doc. 86-5.] Finally, the Court **DENIES** the motion of the District of Columbia for summary judgment on this claim, since the District may be liable under a theory of *respondeat superior* for the alleged torts of the Defendant officers.

*III.E    Trespass – Count 5*

Next, the Plaintiffs allege a claim of trespass against Defendants Chambers, Dumontt, Miller, Thompson, and the District of Columbia. [Doc. 80 at ¶ 63.] Plaintiffs say that these Defendants intentionally interfered with Plaintiff Youngbey's "lawful possession of her real property, including the windows and security door of her home, by damaging or destroying said property." [*Id.*]

In an attempt to open the front door, Officer Miller pried at the front door with a halligan bar, damaging it, and then broke a living room window. [Doc. 89 at 6.] Officer Thompson accompanied Officer Miller to the porch and participated in the alleged no-knock entry. [*Id.*] Defendant officers Lonnie Bruce and Timothy Dumontt entered the home through the broken window. [Doc. 90 at 6.] Officer Dumontt later forced the jammed metal security door open with a battering ram, but also says that he did not damage the wooden front door in the process. [*Id.*]

Trespass is a direct physical interference with, or an unlawful or unauthorized physical invasion of, another's property. To prove a trespass claim in the District of Columbia, a plaintiff must prove "(1) that a trespass to realty occurred, and (2) that such action was tortious or unauthorized." *Wright v. United States*, 963 F. Supp. 7, 19 (D.D.C. 1997).

On the first element, a trespass to realty undoubtedly occurred since the Defendant officers entered the Plaintiffs' home and damaged her real property. The Plaintiffs satisfy the first element of the cause of action. On the second element of the claim, the Plaintiffs must prove that the action was "tortious or unauthorized." *Wright*, 963 F. Supp. at 19. The Defendants rely upon the rule that a valid search warrant is a complete defense to a claim of trespass since the entry is privileged. *See Hammel v. Little*, 87 F.2d 907, 912 (D.C. Cir.1936). However, here, that rule provides no protection because the Defendants did not comply with the terms of the search warrant. Indeed, entering a residence at night with a warrant that only authorizes a daytime search is the equivalent of entering without a warrant at all. *O'Rourke*, 875 F.2d at 1474. Therefore, the Defendants' entry was not privileged and the second element of the cause of action is also satisfied. *See, e.g.*, *Eleuteri v. Richman*, 128 A.2d 743, 747 (N.J. Sup. Ct. 1956) (holding that an illegal search is actionable trespass); *Walsh v. Taylor*, 39 Md. 592 (Md. 1874) ("[W]here a person has . . . exceed[ed] his

Case No. 1:09-CV-00596
Gwin, J.

authority, by doing what he was not authorized or justified in doing, he become a trespasser . . .");

*Assocs. Discount Corp. v. Hillary*, 278 A.2d 592, 596 (Md. 1971).

The Court therefore **DENIES** the motion for summary judgment as to Defendants Chambers, Dumontt, Miller, and Thompson, since these Defendants all participated in or directly planned the unauthorized entry into the home. The Court also **DENIES** the motion of the District of Columbia for summary judgment on this claim, since the District may be liable under a theory of *respondeat superior* for the torts of the Defendant officers.

III.F    *Negligence Per Se – Count 6*

The Plaintiffs bring a claim of negligence *per se* under District of Columbia law for the violation of D.C. Code § 23-523 against Defendants Bruce, Chambers, Dumontt, Fowler, March, Scott, and the District of Columbia. [Doc. 80 at ¶ 64.] All of these Defendants were involved in the planning of the search and the Plaintiffs say that by "planning and executing a nighttime search without the authorization required by D.C. Code § 23-523 . . . [Defendants] violated a statutory duty owed to plaintiffs and brought about the very harm that § 23-523 seeks to prevent." [*Id.*]

A violation of a statute designed to protect a class of people to which the plaintiffs belong against the type of accident that occurred is negligent *per se*. *325-343 E. 56th St. Corp. v. Mobil Oil Corp.*, 906 F. Supp. 669, 686 (D.D.C. 1985) (citations omitted). D.C. Code § 23-523 says that search warrants "shall be executed only during the daytime hours unless the warrant expressly authorizes execution at any time of day or night." Thus, if that statute is designed to protect a class of people to which the Plaintiffs belong against the type of accident that occurred, then the defendants' motion to dismiss this count must fail.

When a statute only protects an individual's enjoyment of rights that he or she is entitled to

-35-

as a member of the public, a negligence *per se* claim usually does not apply, because the statute is not for the purpose of protecting individuals from harm. *325-343 E. 56th St. Corp.*, 906 F. Supp. at 687. But, "where a particular statutory [] standard is enacted to protect persons in plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law." *Dine v. Western Exterminating Co.*, 1988 WL 25511, at *4, (D.D.C. 1988) (italics and citations omitted) (holding that the plaintiffs could not recover because the statute was meant to regulate pesticide manufacture and sale and protect the environment rather than to protect the homeowner or prevent the infiltration of houses by pesticides).[10]

The statute here is similar to D.C. Statute 4-176, violation of which can be a basis for *per se* negligence since the statute penalizes police use of excessive force in order to promote the safety of city residents. *See District of Columbia v. White*, 442 A.2d 159, 164 (D.C. App. 1982). The purpose of D.C. Code § 23-523 is to protect homeowners and residents against service of a search warrant at night by assuring that a magistrate considered the affidavit and whether the facts justified a nighttime search. *See Irwin v. State*, 415 So.2d 1181, 1183 (Ala. Crim. App. 1982) (explaining legislative intent in creating Code of Alabama § 15-5-8, which is very similar to the D.C. Code in its requirements for obtaining a warrant authorizing a nighttime search; *State v. Dudgeon*, 477 P.2d 750, 752-53 (Ct. App. Ariz. 1970). The Plaintiffs in this case belong to the class of District of Columbia homeowners and residents and suffered the harm that the D.C. Code was designed to prevent. Therefore, they successfully assert a claim of negligence *per se*.

------

[10] Even if citizen safety and security is only a partial purpose of the statute, it can still provide a standard of care supporting a negligence *per se* action. *See Rong Yao Zhou v. Jennifer Mall Rest., Inc.*, 534 A.2d 1268, 1276 (D.C. App. 1987).

The Defendants also argue that because the Plaintiffs allege intentional torts that they cannot also allege negligence on the part of the Defendants. Negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart form the intentional tort of excessive force and violative of a distinct standard of care. *District of Columbia v. Chinn*, 839 A.2d 701, 711 (D.C. 2003) (holding that the plaintiffs alleged that the officers assaulted him without provocation but did not assert any separate negligence claim such as that they mistakenly thought he was armed or was a threat). But, however, in *Etheredge v. District of Columbia*, the court allowed the negligence claim, because the officers engaged in negligent acts leading up to the intentional gunshot which could have obviated the need to use deadly force had they used reasonable care in those earlier acts. 635 A.2d 908 (D.C. 1993). "In some cases, the same course of conduct may support both an intentional tort claim and negligence claim, provided that 'the defendant, in the process of engaging in the conduct that included the intentional tort, was also breaching another recognized duty owed to the plaintiff. *Rice v. District of Columbia*, 715 F.Supp. 2d 127, 132 (D.D.C., 2010) (quoting *Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235 (D.C. 2006)).

This claim alleges negligence on the part of the defendants in executing and planning a 4:00 A.M. search. This conduct is separate from the conduct, such as pointing firearms, upon which the Plaintiffs base their allegations of intentional torts. Had the Defendants used reasonable care in planning their search, they would not have entered the house at night without a warrant authorizing nighttime entry and would have complied with their valid daytime warrant. Thus, the Plaintiffs sufficiently allege a claim of negligence *per se.*

Accordingly, because Defendants Bruce, Chambers, Dumontt, Fowler, March, and Scott all participated in the planning of the search, the Court **DENIES** their motions for summary judgment.

A determination by the trier of fact of the extent to which each Defendant participated in the decision to execute the warrant at night by the trier of fact is appropriate. The Court also **DENIES** the motion of the District of Columbia for summary judgment on this claim, since the District may be liable under a theory of *respondeat superior* for the torts of the Defendant officers.

III.G    *Intentional Infliction of Emotional Distress – Count VII*

Plaintiff Youngbey also asserts a claim of intentional infliction of emotional distress under District of Columbia law against Defendants Acosta, Dumontt, Miller, Thompson, Yarbaugh, and the District of Columbia. [Doc. 80 at ¶ 65.] The Plaintiffs say that the named Defendants engaged in "extreme and outrageous conduct that intentionally or recklessly caused plaintiff YoungBey to suffer severe emotional distress." [*Id.*]

To prove a claim of intentional infliction of emotional distress under District of Columbia law, a plaintiff must show:  (1) "extreme or outrageous conduct" which (2) "intentionally or recklessly" (3) causes "severe emotional distress to another." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007). On the first element, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* The defendant's actions must proximately cause the plaintiff's distress, which must be so acute that physical consequences are not unlikely. *Id.* "The ultimate question is whether the recitation of the facts to an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim 'Outrageous!'" *Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 986 (D.C. 1984)). The second element requires that the defendant inflicted severe emotional distress in an intentional or reckless manner. *Chen v. District of Columbia*, 256

F.R.D. 267, 272 (D.D.C. 2009). In some cases it is "possible to infer the existence of . . . intent or recklessness . . . from the very outrageousness of a defendant's conduct." *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. App. 1982). Finally, on the third element – "severe emotional distress" – the distress asserted must be "of so acute a nature that harmful physical consequences might be not unlikely to result." *Id.*

Although the Court finds that taking the disputed material facts in the Plaintiffs' favor would make out a number of actionable torts and constitutional violations, the Court does not find the alleged behavior sufficiently outrageous to satisfy the very high standard of the first element of the cause of action of intentional infliction of emotional distress. For example, the facts in this suit are not nearly as severe as those in *Chen v. District of Columbia* or *Drejza v. Vaccaro*, both of which are cases in which police officers' behavior was found to be outrageous. In *Chen v. District of Columbia*, the court found outrageous conduct when police officers mistakenly arrested the plaintiff for failing to pay a sixty dollar hotel bill, transported her to the hotel against her will, searched her without probable cause, took sixty dollars from her, and refused her requests for an interpreter. 256 F.R.D. 267, 273 (D.D.C. 2009). In *Drejza v. Vaccaro*, the court found outrageous conduct where a detective in the "Sex Offense Branch" who was investigating the recent forcible rape of a woman derided and insulted the victim, telling her that she was promiscuous and wanted to be raped, acted like he found her situation amusing, and otherwise treated her with scorn. 650 A.2d 1308, 1314 (D.C. 1994). The conduct here, although potentially tortious under other theories of recovery if proven true, was not sufficiently extreme to be deemed "outrageous" under the exacting standard of that cause of action, but rather, would merely fall into the realm of improper.

Thus, even with the disputed facts taken in the light most favorable to the Plaintiffs, Plaintiff

Youngbey fails to make out a claim of intentional infliction of emotional distress. The Court

therefore **GRANTS** the Defendants' motions for summary judgment on Count VII of the complaint.

III.H    *Fourth Amendment Monell Claims – Counts 8 and 9*

Finally, Plaintiffs also assert claims directly against the District of Columbia under 42 U.S.C.

§ 1983 for violations of the Plaintiffs' Fourth Amendment rights due to the alleged unlawful

nighttime execution of the search warrant and the alleged failure of the officers to knock and

announce before forcibly entering their home. [Doc. 80 at ¶¶ 66-67.]

To succeed on a claim for relief under § 1983 against a municipality, a plaintiff must prove

that the violation of a federal right occurred as the result of an illegal policy or custom. *Monell v.*

*Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A municipality may not be held liable under § 1983

simply upon the theory of *respondeat superior*. *Bennett v. City of Eastpointe*, 410 F.3d 810, 818

(6th Cir. 2005). A governmental policy or custom, or a policy of inaction, must have been the

moving force directly causing the alleged violation. *Bd. of County Comm'rs of Bryan County v.*

*Brown*, 520 U.S. 397, 403-04 (1997).

First, on the claim asserting a violation of constitutional rights due to the unlawful nighttime

entry, the Plaintiffs allege that the Defendant officers were acting "pursuant to District of Columbia

policy, custom, usage or practice" and that the District of Columbia failed to "adequately train or

supervise the Defendant officers in the legal requirements for executing search warrants at night."

[Doc. 80 at ¶ 66.] Second, on the claim asserting a violation of constitutional rights due to a failure

to knock and announce, Plaintiffs say that the nighttime entry was made "pursuant to District of

Columbia policy or custom, which evidences deliberate indifference on the part of the District of

Columbia" and that the "District of Columbia has actual or constructive knowledge or this custom

or policy of beginning to break down the door before knocking and announcing." [*Id.* at ¶ 67.]

In considering whether a plaintiff has stated a claim for municipal liability, the district court must conduct a two-step inquiry. *Collins v. City of Harker Heights*, 503 U.S. 115, 124 (1992). First, the court must determine whether the complaint states a claim for a predicate constitutional violation. *Id.* Second, if so, then the court must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation. *Id.*

Defendant District of Columbia moves for summary judgment on these grounds, saying that "plaintiffs' claim is that the District is vicariously liable for the conduct of its police officers under 42 U.S.C. § 1983 . . . [and] if the Court determines that plaintiffs' rights were not violated by individual defendants, it only follows that the District, their employer, is also not liable." [Doc. 91 at 1.] Later, Defendants say that "[i]f the Court finds that plaintiffs' constitutional rights were not violated, as a matter of law, then it should dismiss plaintiffs' claims against the District which are derivative." [*Id.*. at 3.]

Defendant District of Columbia's motion for summary judgment seems to misunderstand the basis for municipal liability under the *Monell* doctrine. The District of Columbia argues that it cannot be held vicariously liable, of which *respondeat superior* is a type, for underlying constitutional violations which did not occur. However, a municipality may *never* be held liable for a constitutional violation under a theory of *respondeat superior*. *See Monell*, 436 U.S. at 691. Rather, liability for a constitutional violation accrues for a municipality where a municipality may be held liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. Thus, whether underlying constitutional violations occurred are relevant

only insofar as an underlying constitutional violation is the first prong of the analysis under *Monell*

and its progeny.  *Collins*, 503 U.S. at 124.

The Court first finds, taking the disputed facts in favor of the Plaintiffs, that the Plaintiffs

adequately allege constitutional violations for both the nighttime execution of the search warrant and

the failure to "knock-and-announce."  The Plaintiffs therefore satisfy the first prong of the *Monell*

claims for both constitutional violations.

On the second element of the *Monell* claim, the Plaintiffs must prove the existence of a

custom or policy of the municipality caused the violation.  *Id.*  "There are a number of ways in

which a 'policy' can be set by a municipality to cause it to be liable under § 1983." *Baker v. District*

*of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003)*.  However, here, the Court need not delve into

whether the Plaintiffs make out an illegal policy or custom.  Rather, the District of Columbia entirely

fails to carry its burden as movant of "informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex, 477 U.S. at 323*  (quoting Fed. R. Civ. P. 56(c)).  Thus, the Court

finds the second element satisfied for purposes of this motion and **DENIES** the District of

Columbia's motion for summary judgment on the *Monell* claims.

### IV. Conclusion

For the reasons stated above, the Court **GRANTS** Defendant Scott's motion for summary

judgment on the false arrest claim (Count 2) and Defendants Acosta's, Dumontt's, Miller's,

Thompson's, Yarbaugh's, and the District of Columbia's motions for summary judgment on the

intentional infliction of emotional distress claim (Count 7).  The Court **DENIES** the Defendants'

motions for summary judgment in all other respects.

IT IS SO ORDERED.


Dated: March 1, 2011                              s/            *James S. Gwin*
                                                  JAMES S. GWIN
                                                  UNITED STATES DISTRICT JUDGE